1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**RENO, NEVADA**

ISIDRO C. MARTINEZ                          )    3:04-CV-254-ECR-VPC
                                            )
    Plaintiff,                          )    <u>**ORDER**</u>
                                            )
vs.                                         )
                                            )
WASHOE COUNTY DEPUTY SHERIFF                 )
D. Hobbensfeiken, individually              )
and in his official capacity;               )
UNNAMED WASHOE COUNTY DEPUTY                 )
SHERIFF ONE, individually and in            )
his official capacity; UNNAMED              )
WASHOE COUNTY DEPUTY SHERIFF TWO,            )
individually and in his official            )
capacity; UNNAMED WASHOE COUNTY             )
DEPUTY SHERIFF THREE, individually )
and in his official capacity;               )
DENNIS BALAAM, individually and in )
his official capacity as Sheriff            )
of Washoe County; and WASHOE                 )
COUNTY, a Duly Constituted                   )
Political Subdivision of the                 )
State of Nevada, inclusive,                  )
                                            )
    Defendants.                         )
_____)


**I.  Procedural Background**

    On May 17, 2004, Plaintiff Isidro C. Martinez ("Plaintiff" or

"Martinez") filed a Complaint against Defendants Washoe County

Deputy Sheriff D. Hobbensfeiken, three unnamed Washoe County deputy

1  sheriffs[1], Washoe County and Dennis Balaam, Sheriff of Washoe
2  County, alleging violations of Plaintiff's First and Fourth
3  Amendment constitutional rights, rights under section 1983, and
4  Nevada state common law claims of wrongful arrest, assault,
5  battery, and excessive force.
6       On June 3, 2005, Defendants Washoe County and Balaam filed a
7  Motion for Summary Judgment (#26). On July 13, 2005, Plaintiff
8  filed a response (#36) and Defendant replied (#37) on July 25,
9  2005. For the reasons stated below, Defendants' motion (#26) will
10 be **granted.** We note that the Washoe County Sheriff's Office is not
11 a suable entity and we treat pleadings and references involving the
12 Sheriff's Office as being in regard to Washoe County.

13 **II.  Statement of Facts**

14      We consider the facts taken in a light most favorable to the
15 Plaintiff in deciding this summary judgment motion.
16      On September 27, 2003, near the end of his graveyard shift at
17 approximately 5:30 a.m., Deputy Sheriff Hobbensfeiken was driving
18 northbound on Pyramid Highway near the intersection with Spring
19 Ridge Drive in Sparks, Nevada when he spotted a car speeding in the
20 opposite direction going southbound on Pyramid Highway. Deputy
21 Hobbensfeiken turned his patrol car around to pursue the speeding
22 car and activated his patrol car lights. Upon seeing the patrol

23 ─────────────

24      [1] Although Plaintiff argues that four unnamed sheriff's deputies
25 abused him, he has named in this action only three. Because there has
26 been no amendment to the parties' names, we will proceed referring
27 only three unnamed sheriff's deputies in this order.

28                                   2

car lights, Martinez pulled over at the first available place he could turn off the highway.  This was the Raley's commercial center on the corner of McCarran Boulevard and Pyramid Highway.

After Plaintiff pulled over and Hobbensfeiken pulled up behind him, Hobbensfeiken walked up to Plaintiff's car and made initial contact with Plaintiff to ascertain Plaintiff's identity by examining Plaintiff's driver's license and vehicle registration information.  Hobbensfeiken informed Plaintiff he had been stopped for speeding.  Plaintiff handed over his Nevada state driver's license which had his Social Security number, address, and date of birth on it and presented Hobbensfeiken with his vehicle registration.  He then searched for his insurance information while Hobbensfeiken went back to his patrol car to verify the information Martinez had given him.

Back at his patrol car, Hobbensfeiken contacted the dispatcher, Vivian Meeks ("Meeks") on his car radio to get more information about Plaintiff via a routine warrants and wants check. Meeks informed Hobbensfeiken that Martinez was a possible match for a fugitive warrant out of California for failure to appear for a DUI drug charge.  Meeks then contacted Monterey County by teletype to confirm the warrant. Meeks received information from the warrant confirming Plaintiff's name (Isidro Callejas Martinez or an alias Isidro Campos Martinez), date of birth, California Driver's License number and information about scars on his right arm.  Meeks informed Hobbensfeiken that the information Hobbensfeiken had given matched for name and date of birth but that the social security number was different.  However, Meeks concluded that the fact that

the Social Security number was different was insufficient to prove
Plaintiff was not a match: in some circumstances, she has found,
subjects mistakenly give incorrect information including incorrect
Social Security numbers.  Meeks gave Hobbensfeiken further
information to check if Martinez was a match: the wanted Martinez
had a four scars on his right arm and a scar near his eyes.

Hobbensfeiken returned to Plaintiff's car where he observed
that Plaintiff had the identifying scars.  Hobbensfeiken went back
to his patrol car and told the dispatcher that the scars were a
match.  The dispatcher told Hobbensfeiken to call the National
Crime Information Center ("NCIC").  NCIC had the same information
about the scars as the dispatcher.  NCIC had additional
information: that the wanted Martinez had an old California address
of 876 East 43rd Street in South Central Los Angeles.  NCIC informed
Hobbensfeiken that they would contact Parole and Probation in
California to get them to email a picture of the wanted Martinez.
This would require Hobbensfeiken to take Plaintiff to the jail as
he did not have email capacity in his patrol car.

Hobbesfeiken then returned to Plaintiff's car and ordered
Plaintiff to get out and go to the rear of the vehicle.
Hobbensfeiken asked Plaintiff if he was Isidro Callejas Martinez to
which Plaintiff replied he was not.  Plaintiff was asked his former
address in California and responded, "876 East 43rd Street, South
Los Angeles."  Plaintiff was not told the basis for which he was
being detained however he insisted that Hobbensfeiken was mistaken,
saying "that's not me" and "I don't do drugs and drive."
Hobbensfeiken decided to take Plaintiff into custody due to the

4

number of matched identifiers associated with the California warrant.  Although he did not resist arrest, Plaintiff was handcuffed and Hobbensfeiken placed him in the back of the patrol car.  Hobbensfeiken transported Plaintiff to the jail.  Plaintiff grumbled in the car that the only reason he was being arrested was because he was Hispanic.  Upon arrival at the jail, Hobbensfeiken checked the email photo from the California Parole and Probation Office.  Hobbensfeiken determined the photo was a match. Hobbensfeiken then learned of two other fugitive warrants for the wanted Martinez.  At that point, Hobbensfeiken left the jail at 7:27 a.m., his shift having terminated.

This was not the first time that Plaintiff had been mistaken for Isidro Callejas Martinez.  In 2003, Martinez's paychecks were garnished by the Monterey County Department of Child Services because of Callejas' apparent default on child support payments. In trying to buy a home in 2003, and a truck in 2004, Plaintiff learned through a lending institution that Callejas had an address listed in Los Angeles which was the same as the house that Plaintiff owned at 876 East 43rd Street.

In 2002, Washoe County Deputy Sheriff Todd Hill had pulled Plaintiff over and accused him of being Callejas.  Hill detained Plaintiff for over two hours and searched his arms, stomach and back looking for the tattoos that Callejas was purported to have. Plaintiff was eventually released and Plaintiff took Hill's business card.

After that time, Plaintiff was pulled over approximately seven times and each time, the officers examined his body searching for

tattoos and each time they released him without charging him.  Due
to the continued harassment, Plaintiff has sought to resolve the
issue of his identity.  He obtained a letter from Child Services in
Monterey County, California; he requested printouts from the Nevada
Department of Motor Vehicles; and he has met with Rusty Snyder,
Deputy Community Liaison for the Washoe County Sheriff's
Department.  Snyder assured Plaintiff that such mishaps would not
happen in the future and gave Plaintiff his business card.
However, after the meeting, Plaintiff was again pulled over by the
Sparks Police Department and his body was searched.

After Hobbensfeiken deposited Plaintiff at the jail, Plaintiff
was placed in a small room and made to face the wall while his
hands were handcuffed behind him.  He complained to the officers
(Hobbensfeiken had already left and Plaintiff had been passed over
to other officers) that it was painful for him to stay in this
position as he suffered chest pains.  The officer told him he
didn't care and when Plaintiff attempted to shift his position, the
officer told him not to move.  The officers began by asking what
Plaintiff's real name was, where he had bought his social security
card, and if he had been drinking.  They gave him a breathalyzer
test and took his photograph.  Plaintiff attempted to explain the
situation of mistaken identity and that he had already met with
Snyder but the officers did not give him a chance to explain.

The officers took Plaintiff into a smaller room and told him
to kneel before a bench and place his head on the bench.  One
officer took off the handcuffs while the other used his foot to
hold Plaintiff's head to the bench.  One officer took one hand and

another officer took the other and they both pulled and twisted his hands away from his body.  At the same time, the fourth officer took his legs and crossed them.  The two officers continued to lift Plaintiff above the ground two feet and then to drop him on the concrete.  They continued this treatment four or five times while insisting that Plaintiff admit he was Callejas.  If true, this conduct was nothing less than reprehensible and despicable.

Plaintiff stayed in the small room for approximately four hours.  He was then taken by another officer for more photographing and fingerprinting.  He was visited by a nurse at 1:30 p.m. that day.  After that, more photographs and fingerprints were taken. After waiting again for an hour, he was given a prison uniform and tennis shoes, a shot, was made to shower, and then was sent to a cell.

At 4 or 5 p.m., Plaintiff was sent to a reception area where he spoke to an officer.  Plaintiff spoke again of his problems of identity.  Shortly after this meeting, he was released.  His wife and children had been waiting at the jail but were not given any information as to why Plaintiff had been detained.  They were told that Plaintiff was going to be deported because he was illegal.

Plaintiff's traffic violation charge was dismissed when, at trial, Plaintiff produced proof of insurance.

**III.  Discussion**

**A.  Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  <u>Northwest Motorcycle Ass'n v. U.S. Department of Agriculture</u>, 18 F.3d 1468,

1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Baqdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form-- namely, depositions, admissions, interrogatory answers, and affidavits--only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c); Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. Anderson, 477 U.S. at 248. Summary Judgement is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

**B. Policies of Washoe County**

We note first that Plaintiff has sued Balaam in his official capacity as the Sheriff of Washoe County and in his individual capacity. Suing Balaam in his official capacity is equivalent to suing the County so the analysis for Balaam sued in his official capacity is the same as the analysis of the County's liability. As an individual, Balaam was responsible as the supervisor of his deputies. However, Plaintiff has not alleged any facts that would give rise to supervisory liability for Balaam.

Plaintiff alleges that Washoe County and Balaam implemented policies related to hiring, training and retention of deputies, including Hobbesfeiken, which resulted in the deprivation of Plaintiff's constitutional rights.

The constitutional violations that Plaintiff alleges are: because Hoffenfeiken handcuffed him, false arrest by Hoffenfeiken, equal protection violation by Hoffenfeiken in arresting him, and excessive force applied by the three officers at the jail.

We find that because the conduct of Hoffenfeiken did not result in a constitutional violation and because there was no evidence of any official custom, policy, or practice that would have resulted in the conduct of the three officers, Plaintiff's third claim of custom and policy must be dismissed. The three unnamed Washoe County Deputy Sheriffs were never identified and will be dismissed by separate order. The conduct of these officers who were never identified cannot form the basis for County liability.

Municipalities may be held liable under 42 U.S.C. § 1983 for actions which result in a deprivation of constitutional rights. Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 (1978). However, a municipality cannot be held liable on a respondeat superior theory. Municipal liability is incurred through section 1983 only when "execution of a government policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury..." Id. At 694.

1       We note that the County cannot be held accountable for the

2   actions of Hoffenfeiken and the three unnamed sheriff's deputies

3   under a theory of *respondeat superior* for the federal claims

4   alleged.  Plaintiff must point to a policy, custom or practice that

5   resulted in the deprivation of a constitutional right and has

6   failed to do so, as will be further discussed below.  <u>Davis v.</u>

7   <u>Mason County</u>, 927 F.2d 1473, 1480 (9th Cir. 1991).

8   **1.  Constitutional Violations of Hoffenfeiken**

9   **a.  Excessive Force**

10      Determining whether the force used to effect a particular

11  seizure is "reasonable" under the Fourth Amendment requires a

12  careful balancing of "the nature and quality of the intrusion on

13  the individual's Fourth Amendment interests" against the

14  countervailing governmental interests at stake.  <u>Graham v. Connor</u>,

15  490 U.S. 386, 396 (1989) (internal citations omitted).  Supreme

16  Court jurisprudence has long held that the right to make an arrest

17  or investigatory stop necessarily carries with it the right to use

18  some degree of physical coercion or threat thereof to effect it.

19  <u>Id</u>.  The reasonableness of the force used requires a case-by-case

20  determination of the severity of the crime at issue, whether the

21  suspect poses an immediate threat to the safety of the officers or

22  to others, and whether he is actively resisting arrest or

23  attempting to evade arrest by flight.  <u>Id</u>. (citing <u>Tennessee v.</u>

24  <u>Garner</u>, 471 U.S. 1, 8-9 (1984)).

25      The reasonableness of the use of the force is to be judged

26  from the perspective of a reasonable officer at the scene, rather

27  than with the 20/20 vision of hindsight.  <u>Id</u>.  "The calculus of

28

1  reasonableness must embody allowance for the fact that police
2  officers are often forced to make split-second judgments in
3  circumstances that are tense, uncertain, and rapidly evolving–about
4  the amount of force that is necessary in a particular situation."
5  Id.

6      The reasonableness inquiry in an excessive force case is an
7  objective one: the question is whether the officer's actions are
8  "objectively reasonable" in light of the facts and circumstances
9  confronting them without regard to their underlying intent or
10 motivation.  Id. (citing Stocc v. United States, 463 U.S. 128, 137-
11 39 (1978)).

12      Plaintiff cites US v. Bravo, 295 F.3d 1002 (9th Cir. 2002) for
13 the proposition that use of handcuffs is an unreasonable use of
14 force.  However, the factual scenario of Bravo differs greatly from
15 the facts here and the holding of Bravo does not extend so far as
16 to rule that when a person is not evading arrest, handcuffs cannot
17 be used.

18      Bravo involved the detention and investigatory search of
19 Bravo's toolbox at the United States border.  The question of
20 handcuffing arose when Bravo questioned whether the stop was a
21 "routine" investigation or had converted into a non-routine border
22 arrest.  Id, at 1015-17.  The issue of "handcuffing" related to
23 whether Bravo had indeed been arrested or whether the officers were
24 still conducting the routine border search.  Bravo has nothing to
25 do with whether the use of handcuffs for detention and transport of
26 a suspect to the jail constitutes excessive force.

27

28                                 12

1    We therefore again review the factors applicable to whether
2  Defendant Hobbesfeiken's act of handcuffing Plaintiff constituted
3  use of excessive force.  First, we note that since Plaintiff was
4  already being detained, the use of handcuffs imposed little more
5  force on him than being put into a patrol car, jailed, photographed
6  and fingerprinted.  The Supreme Court has held that the imposition
7  of correctly applied handcuffs on someone who is already being
8  lawfully detained is reasonable.  <u>Mueller v. Men</u>, 125 S. Ct. 1465,
9  1470 (2005).  Here, since, as later discussed, Hoffenfeiken was
10  effecting what reasonably appeared to him to be a lawful arrest and
11  proceeded to lawfully detain the Plaintiff, the use of handcuffs
12  was reasonable.

13    In addition, we note that Hoffenfeiken thought Plaintiff was
14  Callejas for whom an arrest warrant was outstanding on DUI drug
15  charges.  Hoffenfeiken thought Plaintiff was a fugitive and had
16  evaded the law before.  Therefore, the use of handcuffs to detain
17  Plaintiff during his ride to the jail was reasonable.

18  **b.  1983 Claim of False Arrest/Mistaken Identity**

19    Plaintiff claims that Hobbesfeiken's mistake in identifying
20  him constituted false arrest and violated his Fourth Amendment
21  rights.  He claims that because the arrest warrant was for someone
22  else, Plaintiff was unlawfully seized and deprived of his liberty
23  based on the incorrect identification.

24    The Supreme Court has held that the Constitution permits an
25  officer to arrest a suspect without a warrant if there is probable
26  cause to believe that the suspect has committed or is committing an
27  offense.  <u>Devenport v. Alford</u>, 543 U.S. 146, 125 S. Ct. 588, 594

28                              13

(2004).  An arrest is supported by probable cause if "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime."  <u>Beier v. City of Lewiston</u>, 354 F.3d 1058, 1065 (9th Cir. 2004)(quoting <u>Grant v. City of Long Beach</u>, 315 F.3d 1081, 1085 (9th Cir. 2002)).

At the time of the arrest, Hoffenfeiken possessed the following information: (1) there was a valid arrest warrant for a Isidro Callejas Martinez from California (2) Plaintiff's name matched but for the fact that Plaintiff's middle name was Callejas instead of Campos (3) Callejas sometimes went by the alias Campos (4) Plaintiff matched Callejas' date of birth (5) Plaintiff matched Callejas for scars on the forearm and near his eye (6) Plaintiff matched height and weight descriptions of Callejas and (7) Plaintiff's address in South Los Angeles matched Callejas.

Defendant's citation to <u>Baker v. McCollan</u>, 443 U.S. 137, 140 (1979) is directly on point.  As Defendant points out, there a case of mistaken identity caused the brother of a criminal to be detained for three days in jail before the police discovered their mistake. <u>Id.</u>  The Supreme Court held that because McCollan was arrested pursuant to a valid arrest warrant, there was no Constitutional violation for invalid detention.  <u>Id.</u>.

We find the information cited above constituted sufficient probable cause to authorize Hoffenfeiken to make the arrest.  In addition, we note that such detention and suspicion over Plaintiff's identity had been reoccurring–several other police officers, bank officials and sellers having questioned Plaintiff's

14

identity.  Therefore, disregarding a non-match for Social Security number was not unreasonable in light of the fact that several other police officers had made the same mistake of identity.

Plaintiff points to the fact that Hoffenfeiken arrested Plaintiff and took him to the jail despite the fact that Plaintiff's Social Security number was not a match and that he had a valid Nevada state driver's license with him.  The Ninth Circuit has held that "knowingly arresting the wrong man pursuant to a facially valid warrant issued for someone else violates rights guaranteed by the Fourth Amendment."  Lee v. Gregory, 363 F.3d 931, 935 (citing Brown v. Byer, 870 F.2d 975 (5th Cir. 1989).  However, here, Plaintiff has not presented facts upon which we could find that Defendant Hoffenfeiken believed that Plaintiff was not Callejas.  Although Plaintiff points to the fact that the Social Security number did not match and that Plaintiff had a valid Nevada state driver's license, Plaintiff overlooks the overwhelming evidence in the other direction to which Hoffenfeiken was privy. Given the number of matches that were evident (including the California address, scars, name, and date of birth) there is no evidence that Hoffenfeiken was arresting and detaining Plaintiff for an unreasonable suspicion that there was an outstanding facially valid warrant for Plaintiff's arrest.[2]

---

[2]We note that there are cases within the Ninth Circuit where the court has held that mistakes were not reasonable.  However, in those cases, more than a few identifiers did not match.  Here, only one thing did not match Callejas' description and personal information.

Plaintiff then argues that Hoffenfeiken was unreasonable in his arrest in that he refused to listen to Plaintiff's side of the story and that he ignored the evidence of Snyder's card in his wallet.[3]  The Ninth Circuit has recently held that "once probable cause to arrest someone is established, however, a law enforcement officer is not 'required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.'"  Broam v. Bogan, 320 F.3d 1023, 1032 (9th Cir. 2002)(quoting Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). Here, although Plaintiff claimed that he was not Callejas and that he did not "do drugs and drive," Defendant Hoffenfeiken, once he had the matches to name, date of birth, scars and address in Los Angeles, had probable cause to arrest Plaintiff and needed not look further for reasons not to arrest and detain Plaintiff.

---

See Simons v. Marin County, 682 F.Supp. 1463, 1466-67 (N.D. Cal. 1987)(mistake was unreasonable where there were different middle names, different ages, and residences in different areas of California).

[3]We find the evidence that Defendant may have ignored Snyder's business card which was in Plaintiff's wallet unpersuasive.  Plaintiff did not alert Hobbensfeiken to this evidence and it is not clear that Hobbensfeiken even noticed the card. In addition, the simple fact that Plaintiff had Snyder's card does not create any issue of fact on any of the elements. Snyder's card could have been in Plaintiff's wallet for a number of reasons.

16

We therefore find that Plaintiff's claim for false arrest in violation of the Fourth Amendment is without merit.

**c.  Equal Protection Claim**

Plaintiff claims that he was treated differently in that he was incarcerated because of his ethnicity and national origin.  We confine this allegation to the conduct of Defendant Hoffenfeiken for purposes of this motion.

In order to prevail on his claim for violation of his equal protection rights, Plaintiff must prove that Hoffenfeiken "acted in a discriminatory manner and that the discrimination was intentional."  Bingham v. City of Manhattan Beach, 341 F.3d 939, 948 (9th Cir. 2003)(quoting Reese v. Jefferson Sch. Dist. No. 14J, 2098 F.3d 736, 740 (9th Cir. 2000).

The evidence that Plaintiff has presented to prove this claim against Defendant Hoffenfeiken is that Hoffenfeiken stated in his deposition that Plaintiff was born in Mexico, as written on his driver's license, and that Plaintiff had an ID card from Mexico. Plaintiff seems to think that since both of these statements were false and because Hoffenfeiken remembered these details falsely that this proves he acted in detaining and arresting Plaintiff on the basis of intentional discrimination.

Essentially Plaintiff argues that because Hoffenfeiken made false statements about Plaintiff's national origin, that these statements are enough to raise an inference of racial discrimination.  We disagree.  To avoid summary judgment, Plaintiff must be reminded that he must "produce evidence sufficient to permit a reasonable trier of fact to find by preponderance of the

17

evidence that [the decision] was racially motivated." <u>Keyser v. Sacramento City Unified Sch. Dist.</u>, 265 F.3d 741, 754 (9th Cir. 2001)(quoting <u>FDIC v. Henderson</u>, 940 F.2d 465, 473 (9th Cir. 1991)).

Plaintiff overlooks, again, the overwhelming evidence that Defendant Hoffenfeiken was faced with when he decided to arrest Plaintiff-the high number of matches of Plaintiff's identity with the identity of Callejas.  Since he has not presented any evidence of discriminatory intent, Plaintiff has failed to present an issue of fact as to whether Hobbesfeiken's actions violated the Equal Protection Clause.

**2.  Custom or Policy that Resulted in the Behavior of the Three Officers**

Generally, a party may demonstrate municipal responsibility for a federal constitutional violation in one of three ways. First, Plaintiff may show that an individual with policymaking authority within the municipality was guilty of the conduct that led to the injury.  <u>Ramirez v. Las Vegas Metro. Police Dep't</u>, 22 Fed. Appx. 828, 830 (9th Cir. 2001)(quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986)).  Second, Plaintiff might prove that the municipality caused the injury by showing the violation was the result of a municipal custom.  <u>Id.</u>  Finally, Plaintiff might show that the constitutional violation is the product of inadequate training on the part of the municipality. <u>Id.</u>  (Citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989)).

Here, Plaintiff admits that there was no "established policy" of the Washoe County Sheriff's Department in abusing prisoners to

18

coerce them into admitting they were someone else.  Plaintiff relies simply on the fact that inaction on behalf of county officials creates a *de facto* custom or policy.  However, Plaintiff offers no support in the law for such a proposition.

In order to prove that there is a custom favoring abuse and physical coercion, Plaintiff must show that the custom was "so persistent and widespread that it constitutes a permanent and well settled city policy." <u>Ramirez</u>, 22 Fed. Appx. at 830 (quoting <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996)).  Moreover, "liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." <u>Trevino</u>, 99 F.3d at 918.

Plaintiff cannot rely solely on his own personal experience with the Washoe County Sheriff's Department in proving the duration, frequency and consistency necessary to prove a custom of abuse. <u>Ramirex</u>, 99 Fed. Appx. at 830-31.

Plaintiff then argues that Washoe County and Balaam failed to adequately train and supervise their deputies which creates liability on their part.

If a municipal employee violates another's constitutional rights, the municipality may be liable if it had a custom of failing to train its employee and that failure to train caused the constitutional violation. <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 123-24 (1991).

19

Here, Plaintiff has not provided evidence of any custom or practice of inadequate training.  Plaintiff relies on the fact that one police officer (Hobbesfeiken) was not trained according to the procedures set forth in the training manual.  This *does not* "directly" provide proof that the other deputies who allegedly committed the abuse to Plaintiff were inadequately trained or supervised.  Since Plaintiff has failed to even name the other accused deputies and has not provided evidence of a custom (with the requisite frequency, duration and consistency) that resulted in inadequate training of the deputies, Plaintiff's claim of inadequate training and supervision will be dismissed.[4]

### 3.   **Balaam Liability**

We note first that Plaintiff sued Balaam on a 1983 federal claim in his official capacity as the Sheriff of Washoe County and in his individual capacity.  Suing Balaam in his official capacity is equivalent to suing the County.  Therefore, the analysis of Balaam's liability in his official capacity is the same as liability Balaam suffers no liability on that basis.

As an individual, Balaam might be responsible on a 1983 claim as the supervisor of his deputies.  However, Plaintiff has not

---

[4]Plaintiff's last claim, that the sheriff's department did not follow its own policy in only releasing certain information when it told the Plaintiff's family he was illegal and was going to be deported alleges no constitutional violation and is therefore without merit.

20

1   presented any evidence that would give rise to supervisory

2   liability for Balaam.

3   **4.     State Law Claims**

4          Because all of Plaintiff's federal law claims have been

5   dismissed, all state law claims are remanded to state court.

6

7

8   <u>**IT IS HEREBY ORDERED**</u> that Motion for Summary Judgment by Defendants

9   Washoe County and Balaam (#26) is **GRANTED**.

10

11

12  This  <u>23rd</u>  day of November, 2005.

13

14

15                                           _Edward C. Reed._
                                             _____
16                                           UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28
                                     21